## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

---

DEVON WATSON,                                      :
               Plaintiff,                        :
                                  :
               v.                                :    No.  2:23-cv-3246
                                  :
JOHN WETZEL and GEORGE LITTLE,                     :
               Defendants.                       :

---

## **O P I N I O N**
### Defendants' Motion for Summary Judgment, ECF No. 55 – Granted

**Joseph F. Leeson, Jr.**                                    **December 12, 2024**
**United States District Judge**

## I.      INTRODUCTION

Devon Watson spent roughly five years on the Restricted Release List in conditions he asserts were similar to solitary confinement.  He claims that this stay worsened his already precarious mental state.  Watson brings this action, pursuant to 42 U.S.C. § 1983, claiming that the conditions and duration of his confinement violated his Eighth and Fourteenth Amendment rights.  Defendants seek summary judgment, arguing that Watson has failed to establish any constitutional violation.  In the alternative, they argue that they are entitled to qualified immunity.

## II.    BACKGROUND

### A.    Factual Background[1]

On May 24, 2013, Devon Watson began his incarceration after being convicted of robbery, aggravated harassment by a prisoner, aggravated assault, and simple assault. In December of 2017, Watson was transferred from SCI Graterford to SCI Fayette for the Special Management Unit ("SMU") program. His progress through the SMU program was slow but misconduct free. On November 20, 2018, Watson was released into the general population for his Phase 1 probationary period. Just two weeks later, he received two staff assault misconducts. The parties disagree on the nature of the charges. Defendants aver that Watson was the aggressor, *see* PSOF ¶¶ 32-33, while Watson avers that he was not, *see* DSOF ¶¶ 32-33.

Notwithstanding, on April 15, 2019, Watson was removed from the SMU program for placement on the Restricted Release List ("RRL"). The SCI Fayette staff had recommended Watson's removal, citing his aggressive and unpredictable behavior toward staff and other inmates. At that point, Watson had amassed sixty-one misconducts, including nineteen misconducts for assault, two misconducts for fighting, and one for arson. Secretary Wetzel approved the placement on May 13, 2019. On May 16, 2019, Watson was notified of his placement on the RRL.

#### 1.    *The Restricted Release List*

The RRL is a status assigned to inmates who pose a threat to others' safety or the orderly running of the prison. In placing an inmate on the RRL, the decisionmaker(s) consider: "a. Assaultive history against staff; b. Assaultive history against inmates; c. sexual abuse history; d.

---

[1]      The undisputed facts are taken from Defendants' Statement of Material Facts, *see* ECF No. 55-1, as admitted by Plaintiff, *see* ECF No. 56-1. Any facts not taken directly from Defendants' Statement of Material Facts are identified herein with citation to the record.

Escape history, or serious escape attempt; and/or e. Threat to the orderly operation of a facility (i.e. attempting to organize inmates, demonstrated involvement in a Security Threat Group [STG] that poses a risk to the security of a facility, etc.)."  DSOF ¶ 5; PSOF ¶ 5.

Before being placed on the RRL, the Facility Manager will provide various documents to the Executive Deputy Secretary for Institutional Operations ("EDSI"), including the Restricted Release List Placement/Annual RRL Review/Removal Request Form (RRL Form), a written rationale for the placement, DC-46 Vote Sheets, and "a current Psychological Evaluation." DSOF ¶ 7; PSOF ¶ 7.  It is ultimately the Secretary's role to determine whether to initially place and later keep the inmate on the RRL.[2]  Secretary Wetzel has also required and reviewed recent Psychological Evaluations when conducting these reviews.

Once an inmate is on the RRL, psychology staff are required to conduct a mental health assessment of the inmate at least every 90 days.  Each inmate in administrative custody is also seen weekly by his counselor.  Further, the inmate's RRL status must be reviewed annually.  To that end, the "Counselor is tasked with initiating DC-46 Vote Sheet on the RRL annual review and the Unit Manager is tasked with creating the RRL Form for the review."  DSOF ¶ 10; PSOF ¶ 10.  The Program Review Committee ("PRC") reviews the status of the inmates for the first two months while in administrative custody.  After that, the PRC interviews the inmate at least every 90 days.  Watson received this 90-day reviews beginning October 31, 2019.  He also received his annual reviews.

---

[2]      In 2019, when Watson was placed on the RRL, the DC-ADM 802 Administrative Custody Procedures governed RRL placements.  That version of the DC-ADM vested the authority to place or remove an inmate from the RRL in the Department of Corrections Secretary.  In April of 2022, the DC-ADM 802 was updated and the authority to place or remove an inmate from the RRL was shifted to the Executive Deputy Secretary for Institutional Operations ("EDSI").

2.    *The Intensive Management Unit ("IMU")*

At some point, Watson was placed in the IMU program.  Defendants indicate that the

IMU is a program for inmates with assaultive histories to work their way out of the RRL and

back into general population through socialization and skills training.  DSOF ¶¶ 15-17.

Defendants cast the program as "6-tiered phase system based on the inmate's adjustment and

attainment of goals/objectives and is designed to be a three-year program that progressively

increases inmates' privileges until their removal from RRL, and back into general population in

Phase 1 of the program."  *Id.* ¶ 18.  As the inmate moves through the phases toward Phase 1, he

is given more privileges including out of cell time and socialization.  *Id.* ¶ 22.

Watson takes issue with Defendants' characterization of the program, arguing that its

stated goals are merely perfunctory such that the program offers no meaningful opportunity to

reintegrate into the general population.  PSOF ¶ 15-17.  It appears Watson made it only to Phase

4 of the program before regressing after accruing a misconduct for assaulting a staff member.

*See* ECF No. 55, Ex. I.

3.    *Conditions and Duration of Watson's Confinement and His
Mental Health Struggles*

The parties also dispute the *actual* conditions of Watson's confinement.  Defendants aver

that at Phase 6 of the IMU, an inmate still receives the following privileges: "2 hours per day of

exercise out of cell, 7 days per week; 1 phone call per week; video visits 1 time per week; kiosk

privileges; radio/tv privileges; in-cell programming; weekly unit management contact and

psychological contact as required by DOC 13.8.1; showers 3 times per week; commissary

privileges; access to mini law-library and recreational book; and in-cell games, like puzzles."

DSOF ¶ 23.  Watson avers that the reality is much different in that he is far more isolated and far

more restricted than even Phase 6 of the IMU provides.  *See* ECF No. 48, Am. Compl. ¶¶ 35-44; *see also* ECF 56-3

The parties also dispute the state of Watson's mental health.  Defendants aver that an April 20, 2023, Special Psychological Assessment of Watson described his mental status as "largely unremarkable."  DSOF ¶¶ 47-49; *see also* ECF No. 55, Ex. L.  Watson notes that in the very same evaluation, Watson describes himself as manic, detailing past hallucinations which would tell him to hurt himself and/or kill others, past issues with depression and anxiety, suicidal ideations as recent as a few weeks prior, and insomnia which has, at times, caused him to be awake for two to three days before crashing.  *Id*.

Once on the RRL, Watson never made it off until he was released from the custody of the Pennsylvania Department of Corrections altogether in September of 2024.  In all, Watson spent some sixty-four months on the RRL.

### B.    Procedural Background

Watson filed suit on August 18, 2023.  *See* ECF No. 1.  On November 29, 2023, the case was reassigned from the late Judge Smith to the undersigned.  *See* ECF No. 16.  On February 29, 2023, Counsel entered their appearance for Watson.  *See* ECF Nos. 35, 36.  On June 11, 2024, the Court granted Watson's unopposed Motion to Amend his Complaint.  *See* ECF No. 45.  An Amended Complaint was filed on June 14, 2024, seeking an injunction and asserting two claims each against Defendants John Wetzel, George Little, and Michael Wenerowicz.  *See* ECF No. 46.  In Count I, Watson asserts a violation of his procedural due process rights secured by the Fourteenth Amendment.  In Count II, Watson asserts a violation of his Eighth Amendment right to be free from cruel and unusual punishment.  Each claim arises under 42 U.S.C. § 1983 and are asserted against Defendants in their individual capacity.

On October 2, 2024, Defendants filed a Motion for Summary Judgment, arguing that Watson has failed to establish any constitutional violation and that they are entitled to qualified immunity.  *See* ECF No. 55.  The matter is fully briefed and ready for disposition.  For the reasons that follow, the Motion is granted.

## III.    LEGAL STANDARDS

### A.    Summary Judgment – Review of Applicable Law

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A disputed fact is "material" if proof of its existence or nonexistence might affect the outcome of the case under applicable substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Id.* at 257.

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once such a showing has been made, the non-moving party must go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue.  Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts").  The party opposing the motion must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 323.  The court must

consider the evidence in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

    **B.    42 U.S.C. §1983 Claims Generally – Review of Applicable Law**

    42 U.S.C. § 1983 is the vehicle by which federal constitutional claims may be brought in federal court. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Additionally, a "defendant in a civil rights action must have personal involvement in the alleged wrongs." *See Rode*, 845 F.2d at 1207. Moreover, "[b]ecause vicarious liability is inapplicable to ...§ 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

    **C.    Cruel and Unusual Punishment – Prison Conditions – Review of Applicable Law**

    "The Eighth Amendment 'prohibits any punishment which violates civilized standards and concepts of humanity and decency.'" *Thomas v. Tice*, 948 F.3d 133, 138 (3d Cir. 2020) (quoting *Young v. Quinlan*, 960 F.2d 351, 359 (3d Cir. 1992)). In evaluating an Eighth Amendment claim challenging prison conditions, the Court applies a two-part test: "(1) the deprivation must be 'objectively, sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities'; and (2) the prison official must have been 'deliberate[ly] indifferen[t] to inmate health or safety.'" *Johnson v. Pennsylvania Dep't of Corr.*, 846 F. App'x 123, 128 (3d Cir. 2021) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

### D.    Fourteenth Amendment – Procedural Due Process – Prisoner

To succeed on a procedural due process claim, the plaintiff must first demonstrate that plaintiff had a liberty interest protected by the Fourteenth Amendment and, second, that plaintiff did not receive the process plaintiff was due in being deprived of that interest. *Shoats v. Horn*, 213 F.3d 140, 143 (3d Cir. 2000). In *Sandin v. Conner*, "the Supreme Court held that a prisoner is deprived of a state-created liberty interest if the deprivation 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Powell v. Weiss*, 757 F.3d 338, 344 (3d Cir. 2014) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995). With regard to the second step of the inquiry, familiar notions of notice and opportunity to be heard guide the Court's consideration of whether adequate process was provided. *Shoats*, 213 F.3d at 144-45.

### E.    Qualified Immunity – Review of Applicable Law

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A court must consider whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds* by *Pearson*, 555 U.S. 223. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* To be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any

reasonable official in the defendant's shoes would have understood that he was violating it."

*Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014).

## IV.    ANALYSIS[3]

### A.    Eighth Amendment – Cruel and Unusual Punishment[4]

Pursuant to 42 U.S.C. § 1983, Watson seeks damages, claiming Defendants violated his

Eighth Amendment rights by subjecting him to solitary confinement for roughly five years

despite his significant and worsening mental health conditions.  At the outset, the Court notes

that Watson is levying an as-applied challenge based on the circumstances of his own

confinement.  *See Porter v. Pennsylvania Dep't of Corr.*, 974 F.3d 431, 440 n.5 (3d Cir. 2020)

(reasoning that Porter was making an as-applied challenge where his complaint "clearly

articulated the duration and severity of his individual circumstances in solitary confinement").

The Court turns now to the referenced two-part test assessing whether: "(1) the

deprivation must be 'objectively, sufficiently serious; a prison official's act or omission must

result in the denial of the minimal civilized measure of life's necessities'; and (2) the prison

---

[3]        In his Amended Complaint, Watson seeks to enjoin Defendants from placing him in
solitary confinement without the protections of procedural due process.  *See* Am. Compl. ¶ 63(b).
However, Watson has since been released from the custody of the Pennsylvania Department of
Corrections.  Accordingly, Defendants argue that his claim for injunctive relief is now moot.
Watson makes no argument in opposition and the Court agrees with Defendants.  *Blanciak v.
Allegheny Ludlum Corp.*, 77 F.3d 690, 698–99 (3d Cir. 1996) ("If developments occur during the
course of adjudication that eliminate a plaintiff's personal stake in the outcome of a suit or
prevent a court from being able to grant the requested relief, the case must be dismissed as
moot.")

[4]        As outlined, where qualified immunity is invoked, the Court will engage in a two-step
framework assessing: 1) whether the claimant has sufficiently alleged a violation of his
constitutional rights; and 2) whether that right was clearly established when it was allegedly
violated.  *Williams v. Sec'y Pennsylvania Dep't of Corr.*, 848 F.3d 549, 558 (3d Cir. 2017)
("*Williams I*").  Under *Pearson*, the Court need not address these steps in sequential order.  *See
Pearson*, 555 U.S. at 236.  Notwithstanding, the Court will choose to address Watson's claims in
sequential order in an effort to help develop and clarify the scope of our rights in this area.
*Dongarra v. Smith*, 27 F.4th 174, 178 (3d Cir. 2022).

official must have been 'deliberate[ly] indifferen[t] to inmate health or safety.'" *Johnson*, 846 F. App'x at 128 (quoting *Farmer*, 511 U.S. 834).

### 1.    Was the Deprivation Sufficiently Serious?

Defendants argue that there exists no genuine dispute that the conditions of Watson's confinement do not amount to a sufficiently serious deprivation.  The Court disagrees.

To start, the parties disagree over nomenclature.  Watson regards the conditions of his confinement as 'solitary confinement' while Defendants object to that label.  Regardless, the Eighth Amendment inquiry at bar turns on the duration and conditions of the confinement and not the nomenclature thereof.  *See Wayne v. Wetzel*, No. CV 21-4209, 2024 WL 3696467 at *6 (E.D. Pa. Aug. 7, 2024).  This is a necessarily fact intensive inquiry.  Most important to the instant matter are the confluence of Watson's mental health and the conditions and duration of his confinement.

### a.    Conditions of Watson's Confinement

"The deprivation element is adequately pled when the allegations depict conditions where the inmate is denied 'the minimal civilized measure of life's necessities.'" *Clark v. Coupe*, 55 F.4th 167, 179 (3d Cir. 2022) (quoting *Wilson v. Seiter*, 501 U.S. 294, 299 (1991)).  Here, Defendants attempt to draft behind Judge Savage's decision in *Wayne v Wetzel*, arguing that the conditions of Watson's confinement are "essentially identical," Mot. at 6, to those of *Wayne* which Judge Savage held "were not objectively serious and did not pose a substantial risk of harm." *Wayne*, 2024 WL 3696467 at *6.  This does not entitle Defendants to summary judgment.

First, this is an as-applied challenge, not a facial challenge to the RRL's policy.  Watson disputes that the RRL policy provides what it says it provides.  *See* DSOF ¶ 23.  The instant

record is conspicuously silent on Watson's *specific* situation.  In that absence, the Court looks to

Watson's verified complaint to the extent it is "based upon personal knowledge and set[s] out

facts that would be admissible in evidence."  *Revock v. Cowpet Bay W. Condo. Ass'n*, 853 F.3d

96, 100 n.1 (3d Cir. 2017).  There, Watson alleges the following:

> a.     Plaintiff has been confined to cells measuring approximately 7' by 12',
> about the size of a parking space. This living space is further reduced by a steel
> sink, toilet, stool, desk, and bed, leaving Plaintiff with very little room for
> movement;
> b.     Plaintiff is prohibited from participating in any organized therapeutic,
> rehabilitative, vocational, religious, or recreational activities within the prison,
> depriving him of any constructive use of his time;
> c.     Plaintiff is prohibited from participating in parole-required programs,
> rendering him unable to obtain any meaningful parole review and forcing him to
> max out his prison sentence;
> d.     Plaintiff is restricted to no more than five minutes to eat meals of a lower
> quality than that served to the general population;
> e.     Plaintiff is restricted from any physical contact with approved family and
> visitors, and is instead permitted no more than one video visit per week;
> f.     Plaintiff is deprived of meaningful interactions with other inmates due to a
> strict "no talking" rule for inmates in solitary confinement. Plaintiff has also been
> confined to cells with doors that are sealed around the edges to further prevent
> communication;
> g.     Plaintiff has been deprived of any meaningful mental health and medical
> assessments despite his currently mental and physical ailments;
> h.     Plaintiff is permitted only three showers per week;
> i.     Plaintiff's housing units smell strongly of urine and feces;
> j.     Plaintiff is subjected to a humiliating strip search each time he leaves or
> enters his cell;
> k.     Plaintiff is deprived of access to exercise equipment and is only permitted
> to exercise in an "exercise cage" of comparable size to his cell;
> l.     Plaintiff is subjected to 24/7 artificial lighting;
> m.     Plaintiff is subjected to bright flashlights and loud banging every thirty
> minutes during the night, making sleep extremely difficult.

Am. Comp. ¶ 44 (a)-(m).  Further, Defendants' Statement of Facts aver that inmates in Phase 6

of the IMU are afforded two hours of exercise time per day.  Watson contests that he was

afforded even that much.

Courts in this Circuit have found similar conditions (in combination with a sufficient

duration) sufficient to satisfy the objective element of this inquiry.  *See Johnston v. Wetzel*, 431

F. Supp. 3d 666, 678 (W.D. Pa. 2019) (holding that a reasonable juror could find the Eighth

Amendment's objective element met where the inmate's lengthy stay in solitary confinement

"deprived him of, at a minimum, exercise, sleep, social contact and interaction, and

environmental stimulation."); *see also Shoatz v. Wetzel,* No. 2:13-CV-0657, 2016 WL 595337

(W.D. Pa. Feb. 12, 2016) (denying summary judgment where the plaintiff "produced sufficient

evidence for a reasonable fact finder to determine that the cumulative effect of over 22 years in

consecutive solitary confinement constitutes a sufficiently serious deprivation of at least one

basic human need, including but not limited to sleep, exercise, social contact and environmental

stimulation.").

        *b.*    *Watson's Mental Health*

Second, the factual circumstances of *Wayne* differ substantially from Watson, particularly

with regard to mental health.  In *Clark*, the Third Circuit reasoned that a "pre-existing condition

of serious mental illness heightened the impact of solitary confinement, rendering it capable of

inflicting severe mental trauma."  *Clark*, 55 F.4th at 185.  In other words, the more fragile the

inmate's mental health, the more susceptible he is to harm posed by isolation.  Here, Watson's

mental health is considerably more fragile than Wayne's.

There is little discussion of Wayne's mental health in *Wayne v. Wetzel*.  The Court noted

that Wayne "denied mental health issues" at his most recent psychological evaluation.  *Wayne*,

2024 WL 3696467 at *7.  Further, Wayne had an "A" mental health rating and dealt primarily

with anxiety and insomnia.  *Id*. at *7-8.  However, Watson's mental health is far worse.  As

noted, Watson's mental health history reflects a history of suicide attempts, depression, paranoia,

significant insomnia, and other serious mental health challenges — all of which contributed to his "C" mental health rating during the relevant timeframe.  ECF No. 55, Ex. H.

c.      *Duration of Watson's Confinement*

Third, duration is also a relevant consideration.  *See Johnston*, 431 F. Supp. 3d at 679. Watson was initially placed on the RRL in April of 2019 and was released upon maxing out his sentence in September of 2024.  Thus, Watson spent just shy of five and a half years on the RRL. "While no bright line exists to say when the duration of solitary confinement contravenes the Eighth Amendment," the Court holds that the combination of the conditions of Watson's confinement, his particular mental health struggles, and the five-year duration of his stay create a genuine issue of material fact as to whether a sufficiently serious deprivation occurred. *Johnston*, 431 F. Supp. 3d at 679.

Because Defendants moved for summary judgment, it is their burden to demonstrate that there exists no genuine dispute that the conditions of Watson's confinement did not amount to a sufficiently serious deprivation.  *Celotex*, 477 U.S. at 323.  The Court finds that Defendants have fallen short of this burden.

2.      *Whether Defendants Knew of and Disregarded the Risk to Watson*

"A prison official is deliberately indifferent pursuant to the Eighth Amendment if the official knows an incarcerated person faces 'a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.'" *Williams v. Sec'y Pa. Dep't of Corr.,* 117 F.4th 503, 514 n.58 (3d Cir. 2024) ("*Williams II*") (*quoting Farmer,* 511 U.S. at 847)).

Defendants argue that they were not aware of psychological harm posed by Watson's confinement because his evaluations made no mention of his precarious mental health.  The record is unclear on this point.  Defendants rely on an April 20, 2023, Psychological Assessment

13
121224

in which the assessor remarked that Watson's mental status was "largely unremarkable."  DSOF

¶¶ 48, 49.  However, that assessment says far more.  As Watson points out, it notes a history of

hallucinations which would "tell him to hurt himself and kill others", past issues with depression

and paranoia, Watson's own feelings that his mental illness is manic, a past history of suicide

attempts with suicidal ideations as recent as a few weeks prior, and insomnia keeping him awake

for 2-3 days before crashing.  *See* ECF No. 55, Ex. L.  Thus, the Court finds there exists a

genuine dispute as to whether Defendants were aware of the harm restrictive housing posed to

Watson in light of his mental health struggles.[5]

However, Defendants also appear to argue that Watson's confinement served a

penological purpose.  "In evaluating the subjective prong of the Eighth Amendment test, we may

also consider whether officials 'had a legitimate penological purpose' behind their conduct."

*Porter*, 974 F.3d at 446 (quoting *Ricks v. Shover*, 891 F.3d 468, 475 (3d Cir. 2018)).  In other

words, does the evidence show that Defendants were not deliberately indifferent to the

substantial risk of harm but rather more concerned with a penological end?  *Porter v*

*Pennsylvania* explicitly reserved this line of inquiry, stating that the Court did "not hold that all

inmates in solitary confinement or on death row have been subjected to an Eighth Amendment

violation" *per se*.  *Porter*, 974 F.3d at 447 n.12.  In *Porter v. Clarke*, the Fourth Circuit reasoned

that:

> [A] legitimate penological justification can support prolonged detention of an
> inmate in segregated or solitary confinement, similar to the challenged conditions
> on Virginia's death row, even though such conditions create an objective risk of
> serious emotional and psychological harm. Put simply, prison officials tasked with

---

[5]    Defendants do not appear to contest that they knew of the harm that can result from
prolonged solitary confinement generally.  Indeed, Watson cites a number of cases in which
Defendant Wetzel acknowledges as much.  *See e.g. Johnson v. Wetzel*, 209 F. Supp. 3d 766
(M.D. Pa. 2016).  However, because Defendants do not put this aspect of the claim at issue, the
Court need not address it.

> the difficult task of operating a detention center may reasonably determine that prolonged solitary detention of the inmate is necessary to protect the well-being of prison employees, inmates, and the public or to serve some other legitimate penological objective.

*See Porter v. Clarke*, 923 F.3d 348, 362–63 (4th Cir. 2019).  Thus, Defendants may be entitled to summary judgment if they can show there exists no genuine dispute that the conditions and duration of his confinement were penologically justified.

At the outset of his placement on the RRL, Watson had 61 misconducts, 19 of which were for assault, 2 of which were for fighting, and 1 of which was for arson.  During his time on the RRL, Watson continued to accrue misconducts including a March 10, 2024, incident in which he assaulted two staff members.  *See* ECF No. 55, Ex. K.  Watson does not contest this but instead argues that his misconduct history should be viewed (as it must) in a light most favorable to him, implying that whether his lengthy RRL stay was justified by a penological purpose is a question better reserved for the jury.

Construing all reasonable inferences in favor of Watson, the Court agrees and holds that Defendants are not entitled to summary judgment on this point.  In *Porter*, the Third Circuit rejected the Department of Corrections' argument that it had a legitimate penological justification for keeping the plaintiff in indefinite solitary confinement where it failed to offer "any evidence about the risk that [the plaintiff] specifically poses, or any individualized argument about [the plaintiff] at all." *Porter*, 974 F.3d at 446.

Here, Defendants fare somewhat better by citing Watson's considerable history of misconduct.  The parties also agree that since Watson was placed on the RRL, he has accrued still more misconducts.  However, outside of just one assaultive misconduct which took place nearly five years after his initial placement on the RRL, *see* Ex. K, Defendants fail to offer just what those other misconducts are and how they justified Watson's continued confinement.  That

is simply not enough to carry Defendants' burden at this stage. *See H'Shaka v. O'Gorman*, 444 F. Supp. 3d 355, 380 (N.D.N.Y. 2020) ("even if Plaintiff's past violent behavior provides a possible penological justification, there is a point at which circumstances . . . reasonably suggest that such justification is no longer legitimate. Whether or not Defendants have shown a sufficient penological justification relies on outstanding questions of fact that a jury must decide.")

Accordingly, the Court finds that a reasonable jury may infer that Defendants knew of the substantial risk of harm Watson faced during his prolonged restrictive housing stay and "fail[ed] to take reasonable measure[s] to abate it." *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 229 (3d Cir. 2015) (quoting *Farmer*, 511 U.S. at 847). Summary judgment on the Eighth Amendment claim is thus inappropriate.

**B.      Fourteenth Amendment – Procedural Due Process**

Watson's next claim is that he was denied procedural due process where he was kept in restrictive confinement for a prolonged duration without any meaningful review of his RRL status. As noted, procedural due process is a two-step inquiry. First, the Court determines whether Watson has established a liberty interest. This is a question of law. *See Colon v. Howard*, 215 F.3d 227, 230 (2d Cir. 2000). Second, the Court will determine whether the process provided "was sufficient to pass Constitutional muster." *Shoats*, 213 F.3d at 143.

*1.      Liberty Interest*

Under *Sandin*, prisoners have a due process protected interest in "freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. This Circuit's jurisprudence has refined that standard to focus on the conditions and duration of confinement. Defendants argue that Watson

did not endure the conditions nor duration of confinement necessary to establish a liberty interest. The Court disagrees.

### a.    Conditions of Watson's Confinement

Again, Defendants' Motion is largely silent on the specific conditions of Watson's confinement. However, treating his Amended Complaint as an affidavit, there exists a genuine dispute as to whether the conditions he was subject to are like those of *Shoats* and *Williams II*. In those cases, the Third Circuit singled out, "[a]mong the range of hardships," the twenty-two to twenty-four hour a day isolation, the isolation of the inmates' mealtime, the conditions of the inmate's exercise time, the prohibition of participation in any classes, and the invasive strip searches. *See Williams v. Sec'y Pennsylvania Dep't of Corr.*, 848 F.3d 549, 562-63 (3d Cir. 2017) ("*Williams I*"); *see also Shoats*, 213 F.3d at 144-45.

Here, Watson avers that he is, *inter alia*, confined to a cell measuring roughly seven by twelve feet. Defendants aver that at Phase 6 of the IMU, an inmate receives 2 hours a day for exercise. Watson contests that he even receives those few hours out of his cell. Further, he is prohibited from participating in any organized classes and is severely restricted in the time allotted to eat his meals. He is also deprived of interactions with other inmates due to a "no talking" rule in place. Finally, he is subject to the same strip search prior to what limited exercise he is afforded. These conditions are enough to establish a liberty interest if Watson endured them for a substantial duration.

### b.    Duration: Prolonged & Indefinite

To establish a liberty interest, the duration of the conditions must be "prolonged and indefinite." *Porter*, 974 F.3d at 450. As noted, Watson spent roughly five and a half years on the RRL. "There is no bright line defining where the duration of segregation becomes atypical."

*Blount v. Mason*, No. CV 3:22-0056, 2023 WL 6276680, at *7 (M.D. Pa. Sept. 26, 2023).

Instead, Courts turn to cases of like circumstances as guideposts in this determination.  *See, e.g.,*

*Mitchell v. Horn*, 318 F.3d 523, 532 (3d Cir. 2003) (string citation comparing durations); *see*

*also Fraise v. Terhune*, 283 F.3d 506, 523 (3d Cir. 2002) (same).

　　In *Brathwaite v. Phelps*, the District Court, sitting in a like disposition, held that three

years in such restricted conditions was prolonged within the 'liberty interest' inquiry.

*Brathwaite v. Phelps*, No. 10-CV-646-SB, 2023 WL 2709737 at * 7 (D. Del. Mar. 30, 2023).

The Court agrees and holds that the conditions of Watson's confinement, coupled with its five-

year duration, is sufficient to establish a liberty interest.[6]

　　　　2.　　*Was Watson Given the Process he was Due?*

　　However, finding a protected liberty interest is only half the battle.  Watson must also

show that he was not given the process he was due.  With regard to his initial placement on the

RRL, Watson was given due notice of the reasons for placing him on the RRL and "an

opportunity to present his views to the prison official charged with deciding whether to transfer

him to administrative segregation."  *Shoats*, 213 F.3d at 145 (quoting *Hewitt v. Helms*, 459 U.S.

---

[6]　　　The 'indefinite' inquiry is somewhat more opaque.  In *Wilkinson*, the Supreme Court singled out the indefinite nature of the claimant's confinement.  *See Wilkinson v. Austin*, 545 U.S. 209 (2005).  There, the restricted housing was "indefinite and . . . reviewed just annually," "limited only by" the inmate's sentence.  *Id*. at 215, 224.  Here, the indefinite nature of Watson's confinement is in dispute.  Defendants point to the IMU program as a "path for inmates with assaultive histories to work toward removal from the RRL, and back to general population." DSOF ¶ 15.  It is a lengthy program which affords the inmate progressively more privileges until they are released back into general population.  *Id.* ¶ 18.  Watson contests this characterization, arguing that the program offers only arbitrary standards for progress as evidenced by his own "perfunctory reviews." PSOF ¶ 18.  If the IMU provides a legitimate pathway out of the RRL, Watson's stay is not indefinite because it is subject to measurable progress along the program. However, if Watson can only move through the program by meeting arbitrary standards, his stay is more indefinite. Notwithstanding, given the conditions and duration of Watson's prolonged term in restrictive confinement, the Court finds that Watson has demonstrated a liberty interest.

460, 476 (1983)).  Thereafter, while still on the RRL, Watson was due meaningful periodic

reviews.  The reviews must be meaningful in the sense that the review is not conducted in "rote

fashion," *see Sourbeer v. Robinson*, 791 F.2d 1094, 1101 (3d Cir. 1986), becoming an ostensible

mechanism for indefinite restrictive confinement.  They must also be periodic in the sense that

they are conducted with such frequency that the reasons justifying the confinement are "current."

*Shoats*, 213 F.3d at 146.

Defendants argue that they are entitled to summary judgment because there exists no

genuine dispute of material fact that Watson was afforded the process he was due.  They argue

that his initial and continued placement on the RRL is subject to the administrative policy set

forth in DC-ADM-802 which provides constitutionally sufficient process.  Defendants argue, and

Watson does not meaningfully dispute, that Defendants complied with this policy by giving

Watson notice of his initial RRL approval, *see* DSOF ¶ 42, reviewing his RRL status every 90

days, *see id.* ¶ 44, and assessing Watson's RRL status annually, *see id.* ¶ 45.

Instead, Watson argues that that his routine reviews amount to the type of "inconvenient

ritual[s]" rejected by the Third Circuit.  *Williams I,* 848 F.3d at 575.  In other words, Watson

levies another as-applied challenge.  In support, he directs the Court's attention to his April, July,

and October 90 day reviews, each of which summarily recommend that Watson remain in Phase

5 of the IMU.  *See* ECF No. 56, Ex. A, DC0006-0008.  Watson thus argues that these summary

reviews create a genuine dispute as to whether he was given "meaningful review" as required by

law.

The Court disagrees.  The record is clear that Watson was placed in Phase 5 of the IMU

program following the February 2023 Review.  *Id.* at DOC0004.  Phase 5 lasts a minimum of

nine months before the inmate can progress to Phase 4.  Indeed, the very next review, in

November of 2023, moved Watson to Phase 4.  *Id.* DOC0005.  This is exactly nine months after Watson entered Phase 5.  Thus, the evidence Watson cites in rebuttal does not reflect an "inconvenient ritual" but rather measurable progress on Watson's path out of restrictive housing.[7]

Accordingly, the Court holds that there exists no genuine issue as to whether Watson was afforded adequate due process throughout his time on the RRL.  Summary judgment is thus granted with respect to Count I.

### C.    Qualified Immunity

Because Watson has shown that a reasonable juror could determine that Defendants violated his Eighth Amendment rights, the Court must now determine whether Defendants are entitled to summary judgment based on qualified immunity.

#### 1.    *Preliminary Findings*

First, however, the Court notes two additional rules it must follow when conducting a qualified immunity analysis at the summary judgment stage.  First, it must "specify those material facts that are and are not subject to genuine dispute and explain their materiality." *Forbes v. Township of Lower Merion*, 313 F.3d 144, 146 (3d Cir. 2002).  Second, it must "analyze separately, and state findings with respect to, the specific conduct of each [defendant]." *Grant v. City of Pittsburgh*, 98 F.3d 116, 126 (3d Cir. 1996).

---

[7]    Watson also argues that he was never afforded a meaningful opportunity to respond to the reasons provided.  In support, he points only to a July 22, 2022, letter from the PA Department of Corrections declining to take action on Watson's letter because "appeal of placement on the Restricted Release List is not permitted" in accordance with the DC ADM 802.  ECF No. 56, Ex. B.  However, Watson has not provided a copy of the letter this is in response to.  Thus, the Court is unable to make any assessment as to whether the letter at Exhibit B falls constitutionally short.

Here, that matter is straightforward.  At various points throughout Watson's time on the RRL, Defendants Wetzel, Little, and Wenerowicz each had final decision-making authority for keeping Watson on or removing him from the list.  When Watson was placed on the RRL in 2019, the DC-ADM 802 gave the Department of Corrections Secretary that ultimate determination.  John Wetzel was the former Acting Secretary of the Pennsylvania Department of Corrections until his resignation in September of 2021.  George Little was the Acting Secretary of the Department of Corrections from September of 2021 until January of 2023.  When the DC-ADM was updated in April of 2022, it shifted the final decision-making authority to the DOC Executive Deputy Secretary for Institutional Operations.  That individual is Michael Wenerowicz.

Thus, Wetzel held final decision-making authority for Watson's placement on the RRL until his resignation in 2021.  Then, Little held final decision-making authority until the DC-ADM changed in April of 2022 and placed final decision-making authority in Wenerowicz.  The specific conduct alleged is each Defendants' refusal to remove Watson from the RRL despite the harm a prolonged stay posed to his mental health.

### 2.    Was the right clearly established?

Determining whether a right was "clearly established" entails a two-part inquiry.  First, the Court will "define the right allegedly violated at the appropriate level of specificity."  *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012).  The right must be framed "in light of the specific context of the case, not as a broad general proposition."  *Saucier*, 533 U.S. at 201.  Second, the Court will "ask whether that right was 'clearly established' at the time of its alleged violation, i.e., whether the right was 'sufficiently clear that a reasonable official would understand that

what he is doing violates that right.'" *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021)

(quoting *Saucier*, 533 U.S. at 202)).

a.      *Framing the Right at Issue*

"The dispositive question is 'whether the violative nature of *particular* conduct is clearly

established.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *al-Kidd*, 563 U.S. at 741

(emphasis added)).  In the instant case, the framing of the right is critical.  In this Circuit, the last

decade or so has seen a steady development of the law concerning the Eighth Amendment rights

of mentally ill prisoners held in prolonged and restrictive confinement.  A brief review of that

history helps determine the Court's framing of the right at issue in this case.

*Palakovic v. Wetzel* concerned a man with considerable mental disorders and a history of

suicide attempts who was repeatedly placed in solitary confinement before ultimately and

tragically killing himself.  *Palakovic v. Wetzel*, 854 F.3d 209, 215-17 (3d Cir. 2017).  Palakovic's

parents filed a complaint asserting, *inter alia*, violations of their son's Eighth Amendment rights.

*Id.* at 218-19.  After the District Court dismissed the claim, the Third Circuit reversed.

Regarding the objective element, the Third Circuit acknowledged "the robust body of

legal and scientific authority recognizing the devastating mental health consequences caused by

long-term isolation in solitary confinement." *Id.* at 225.  Regarding the subjective element, the

Third Circuit reasoned that the defendants were aware of the harm solitary confinement posed to

Palakovic by way of three circumstances.  First, Palakovic disclosed his prior suicide attempts to

the prison during his intake.  *Id.* at 230.  This caused the prison to identify Palakovic as a suicide

risk.  *Id.*  Second, the prison was already being investigated by the DOJ for subjecting mentally

ill persons to prolonged periods of isolation.  *Id.* at 231.  Third, the defendants were aware of

recent "suicides and instances of self-harm" by those in solitary confinement.  *Id.* at 226.  The

22<br>121224

Third Circuit held that these averments were indeed sufficient to state a claim for violation of Palakovic's Eighth Amendment rights.

More recently, *Porter v. Pennsylvania Dep't of Corr.* concerned an inmate who had been placed "in solitary confinement on death row for more than thirty-three years." *Porter*, 974 F.3d at 436. Porter was confined to a cell "no larger than 7 feet by 12 feet" which was made smaller by its permanent metal fixtures. *Id.* Porter spent an "overwhelming majority" of his time alone in his cell, only leaving for exercise in a cage, work duty, or his thrice-weekly showers. *Id.* When he could leave his cell, Porter had to undergo an invasive visual strip search. *Id.* He was allowed just one non-contact personal visit per week and three telephone calls. *Id.* Throughout the duration of his confinement, Porter received no disciplinary infractions. *Id.* at 437. "In his Complaint, Porter alleged that his solitary confinement caused 'irreversible damage' to his mental health . . . includ[ing] 'severe anxiety, depression, panic, paranoia, bipolar mood swings, and at sometimes [sic] suicidal impulses.'" *Id.* (internal citation omitted).

Porter levied an as applied challenge, arguing that the defendants "violated his Eighth Amendment right to be free from cruel and unusual punishment by subjecting him to solitary confinement for thirty-three years." *Id.* at 440. Employing *Farmer*'s two-part test, the Third Circuit held that Porter's deprivation was indeed sufficiently serious, citing a coalescing legal and scientific consensus that prolonged "solitary confinement posed a substantial risk of harm to Porter." *Id.* at 443. Further, the Court held that the defendants knew of that risk by way of testimony in prior lawsuits and DOC policy.[8] *Id.* at 445-47. Notably, included in its analysis of

---

[8]    The relevant policy stated that "[i]f the inmate has a mental illness, the PRC [Program Review Committee] should explore the feasibility of placing him/her into [other treatment units] as an alternative ...." *Porter*, 974 F.3d at 446.

the 'subjective' element of Porter's claim, was the utter lack of penological justification for the prolonged confinement. *Id*. at 447.

Ultimately, the Court held that "a reasonable jury could find that Defendants know that prolonged solitary confinement has serious detrimental health impacts, but that they have disregarded the risk in Porter's case by leaving him in isolation for more than thirty-three years." *Id*. at 447. Notwithstanding, the Court held that Porter's Eighth Amendment right had not been clearly established, singling out the 'death row' nature of Porter's confinement. *Id*. at 450.[9]

Still more recent, in *Clark v. Coupe*, the Third Circuit held that "that someone with a known preexisting serious mental illness has a clearly established right since at least 2016 not to be held in prolonged solitary confinement." *Williams II*, 117 F.4th at 518. Notwithstanding, the procedural posture of that case (it was a motion to dismiss) left open any "exigent circumstances and legitimate penological justifications" for the confinement. *Clark*, 55 F.4th at 188.

And finally, *Williams II* concerned a death row inmate held in solitary confinement for twenty-six years. There, the Third Circuit reversed the District Court's finding of qualified immunity, holding that "a death row prisoner, with a known preexisting serious mental illness" had a clearly established right "not to be placed and held in prolonged solitary confinement [] without penological justification." *Williams II*, 117 F.4th at 517. By its own characterization, *Williams II* is "nearly identical to the holding in *Clark v. Coupe* . . . merely clarif[ying] that the clearly established right in *Clark* extends to individuals on death row." *Id*. at 524-25.

---

[9]    Notwithstanding, the Court held that "from this point forward, it is well-established in our Circuit that such prolonged solitary confinement satisfies the objective prong of the Eighth Amendment test and may give rise to an Eighth Amendment claim, particularly where, as here, Defendants have failed to provide any meaningful penological justification." *Porter*, 974 F.3d at 451.

The Court now returns to where it started, noting that in the instant case, the framing of the right is critical. The Court could frame the right broadly and draft behind *Clark*, holding that by 2019, Watson had a clearly established right not to be held in prolonged solitary confinement because of his preexisting and serious mental illness. However, that framing omits a key circumstance in his prison misconduct record which weighs on the subjective element of his Eighth Amendment claim.

Instead, the Court frames the right as follows: the right of a prisoner, known to be seriously mentally ill, to not be placed in restricted confinement for an extended period of time by prison officials who were aware of the risk posed by such conditions but mindful of the prisoner's substantial and continuing disciplinary record. This framing incorporates the three most important aspects of Watson's circumstances: the conditions of his confinement, his mental health, and any penological justification for keeping him in restricted confinement. The Court analyzes this case through that framework.

### b.    Was the Right Clearly Established?

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 248 (3d Cir. 2016) (quoting *al-Kidd*, 563 U.S. at 741) (internal quotation marks omitted). This is a high bar. "A right is clearly established where existing precedent has 'placed the statutory or constitutional question beyond debate.'" *Williams II*, 117 F.4th at 515. "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015) (quoting *al-Kidd*,

563 U.S. at 743)).  "The ultimate question is whether the state of the law when the offense

occurred" gave the prison officials "fair warning" that their conduct violated [the claimant's]

Eighth Amendment right."  *Clark*, 55 F.4th at 181 (quoting *L.R.*, 836 F.3d at 248)).

> In determining whether a right is clearly established, the Court:
>
> Look[s] first for applicable Supreme Court precedent. If none exists, we consider whether there is a case of controlling authority in our jurisdiction or a robust consensus of cases of persuasive authority in the Courts of Appeals that could clearly establish a right for purposes of qualified immunity. The authority need not be directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.

*Barna v. Bd. of Sch. Directors of Panther Valley Sch. Dist.*, 877 F.3d 136, 142 (3d Cir. 2017)

(internal citations, quotation marks, and alterations omitted).

Since qualified immunity is an affirmative defense, Defendants bear the burden of

proving its applicability.  *See Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014).  Here,

Defendants argue that, "given the information they each had," Watson cannot establish that any

possible Eighth Amendment violation was "beyond debate."  Mot. at 15.  Elsewhere in its

Motion, Defendants identify the "given information" as Watson's misconduct and psychological

records.

In response, Watson merely argues that "the Third Circuit Court of Appeals has held

those rights as asserted in this lawsuit have been clearly established for purposes of defeating

qualified immunity."  Resp. at 9.  He then cites *Porter* and *Williams II* in support.  The Court

finds that neither of these cases contain a sufficiently similar fact pattern.  Incorporating its prior

discussion of these cases, the Court reiterates that in *Porter*, the defendants failed to offer "any

evidence about the risk that Porter specifically poses, or any individualized argument about

Porter at all."  *Porter*, 974 F.3d at 446.  That is not the case here.  Defendants have cited the

initial justification for placing Watson on the RRL *as well as their continuing justification in his ongoing misconducts*.

The cite to *Williams II* is no better. As noted, *Williams II* is "nearly identical to the holding in *Clark v. Coupe* . . . merely clarif[ying] that the clearly established right in *Clark* extends to individuals on death row." *Williams II*, 117 F.4th at 524-25. *Clark*, in turn, held that a prisoner with a known preexisting serious mental illness has a clearly established right not to be held in prolonged solitary confinement. *Clark*, 55 F.4th at 185. However, given the procedural posture of *Clark*, the Court reserved the idea that there might be "exigent circumstances and legitimate penological justifications for Clark's seven-month stint in solitary confinement that would lead to the conclusion that no clearly established right was violated." *Clark*, 55 F.4th at 188. In *Clark*, that remained to be seen. However, it *is* seen here because Defendants have presented those justifications.

Beyond the parties' arguments, the Court's own research yields no Supreme Court precedent, controlling authority in the Third Circuit or robust consensus of cases of persuasive authority in the Courts of Appeals with a sufficiently similar fact pattern. And likely for good reason. Weighing any justification for restrictive confinement is a judgment call balancing the inmate's rights with the safety of all who occupy the prison. The questions that follow are myriad. To name just a few, a prison official might ask what sort of misconduct justifies continued detention? Must they be assaultive or violent or can they be for simply disobeying orders? How long after the inmate is placed on the RRL will this threat to the prison staff or others subside?

The answers to all of these questions are informed by the prison official's expertise and experience to which the Court accords deference. *See Hewitt v. Helms*, 459 U.S. 460, 472 (1983)

(quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979) ("Prison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.")  That is not to say the Court overlooks its duty to review such decisions and Watson's constitutional rights.  However, it is to say that these decisions do not lend themselves well to bright or "clearly established" lines of conduct.  They are difficult judgment calls of the sort that ought to be protected by qualified immunity.  Whether the Defendants may have erred in keeping Watson in restricted confinement for so long is not so obvious a question that "every reasonable official would have understood" they were violating Watson's rights.  *L.R.*, 836 F.3d at 248.

Accordingly, the Court finds that Defendants are entitled to qualified immunity on the Eighth Amendment claim.

## V.    CONCLUSION

For the reasons outlined above, Defendants are entitled to summary judgment on each of Watson's claims.  He has failed to establish any genuine issue of material fact as to his Fourteenth Amendment claim and Defendants have shown they are entitled to qualified immunity on the Eighth Amendment claim.

A separate Order follows.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*_____
JOSEPH F. LEESON, JR.
United States District Judge